IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KANE COUNTY, UTAH (2), (3), and (4), a Utah political subdivision; and STATE OF UTAH, <br><br> Plaintiffs (or Plaintiff-Intervenor, as to State of Utah in Kane County (2)), <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant, <br><br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE et al., <br><br> Defendant-Intervenors. | **MEMORANDUM DECISION AND ORDER DENYING SUWA'S FIFTH MOTION TO INTERVENE AS OF RIGHT and RETAINING FOURTH AMENDED PERMISSIVE INTERVENTION ORDER** <br><br> Consolidated Case No. 2:10-cv-1073-CW[1] <br><br> (Consolidated with Case Nos. 2:11-cv-1031-CW and 2:12-cv-476-CW) <br><br> Judge Clark Waddoups <br><br> **Docket also in the following Case Nos:** <br> 1:12-cv-105  2:12-cv-451 <br> 2:10-cv-1073  2:12-cv-452 <br> 2:11-cv-1043  2:12-cv-461 <br> 2:11-cv-1045  2:12-cv-462 <br> 2:12-cv-423  2:12-cv-466 <br> 2:12-cv-425  2:12-cv-467 <br> 2:12-cv-428  2:12-cv-471 <br> 2:12-cv-429  2:12-cv-472 <br> 2:12-cv-434  2:12-cv-477 <br> 2:12-cv-447 |

---

[1] All "ECF No." references in this memorandum decision refer to docket entries in **Case No. 2:10-cv-1073**, unless otherwise noted.  Additionally, when referring to a page number, the court references the ECF page numbering at the top of the page and not the numbering at the bottom of a document.

## INTRODUCTION

On March 6, 2020, a mandate issued from the Tenth Circuit Court of Appeals that allowed SUWA[2] to intervene as of right on the issue of scope in *Kane County (1)*, *Utah v. United States*, No. 2:08-cv-315) (D. Utah) (hereinafter "*Kane County (1)*").[3]  Based on that ruling in *Kane County (1)*, SUWA has now filed a fifth motion to intervene as of right[4] in this case—*Kane County (2)*—on the issues of title *and* scope.

_____

[2]  Unless otherwise specified, "SUWA" collectively refers to the Southern Utah Wilderness Alliance, The Wilderness Society, and the Sierra Club.

[3]  The Tenth Circuit ruled twice before that SUWA could not intervene as of right in *Kane County (1)*.  *See Kane County v. United States*, 597 F.3d 1129 (10th Cir. 2010); Order, at 2 (Sept. 2, 2014) (Appellate Case Nos. 13-4110, 13-4109, 13-4108).  Thus, the *Kane County (1)* decision now referenced by SUWA was the Tenth Circuit's third decision on the matter, which citation is *Kane County (1) v. United States,* 928 F.3d 877 (10th Cir. 2019).  For simplicity, however, the court will simply refer to it herein as the "*Intervention Ruling*."

[4]  SUWA has filed five motions to intervene on the docket for *Kane County (2)* as follows:

- On April 22, 2013, SUWA filed an entry on the *Kane County (2)* docket moving to intervene in *Kane County (3)* (ECF No. 103).  Four days earlier, the court had consolidated and merged *Kane County (3) v. United States*, 2:11-cv-1031 into *Kane County (2) v. United States*, 2:10-cv-1073.  Order, at 3 (ECF No. 91); *see also* Order, at 1 n.2 (ECF No. 181) (explaining function of local rule DUCivR 42-1(b) that, "upon consolidation, a merger occurs with the lower-numbered case and the higher numbered case is closed").  Because the two cases were merged and consolidated, a separate motion to intervene was unnecessary, but it was one of the motions to intervene the court has had to address in this case.

- SUWA filed a second Motion to Intervene on April 23, 2013 (ECF No. 105).

- SUWA filed a Renewed Motion to Intervene on May 25, 2018 (ECF No. 410), which should have only been lodged as discussed later in this memorandum decision.

- SUWA filed a fourth Motion to Intervene on July 10, 2019 (ECF No. 516).

- After the fourth motion was terminated as moot, on July 25, 2019, SUWA then filed a motion to obtain full participation or to revive its fourth Motion to Intervene (ECF No. 530).  On September 5, 2019, the court decided the motion to obtain full participation

Intervention as of right has serious effects.  Courts have allowed one who cannot bring a claim or defense on its own to enter a suit and obtain the right to "conduct discovery, participate fully at trial, and pursue an appeal in the event of an adverse judgment."  Caleb Nelson, *Intervention*, 106 Va. L. Rev. 271, 274–75 (2020) (hereinafter, "Nelson").  Despite the importance of intervention law, one professor has accurately noted, "the law governing motions [to intervene] is a mess."  *Id.* at 274.

In this case, the State of Utah and Kane County assert title to certain roads that cross federal land.  Although the roads at issue came into existence before SUWA did,[5] SUWA nevertheless asserts it has rights that will be infringed if it is not permitted to intervene as of right.  Indeed, SUWA contends its rights are so important that the United States, as the sovereign landowner, cannot possibly defend title and scope adequately without SUWA's involvement.

This case, however, is now at the post-trial stage.  Throughout the proceedings in this case, the United States has vigorously defended against Plaintiffs' claims to title.  During a three-week bench trial, the court observed that very defense, which the United States put on through multiple attorneys.  In its post-trial briefing, the United States seeks dismissal of *every* bellwether road in this case on jurisdictional grounds.  *See* United States' Amended Motion to Dismiss (ECF No. 671).  To the extent jurisdiction is found, the United States has not conceded title to a single road

---

and the fourth Motion to Intervene on the merits.  Mem. Dec., at 2–3 (ECF No. 549), *also located at Kane Cnty., Utah (2), (3), & (4) v. United States*, 333 F.R.D. 225, 228–29 (D. Utah 2019).

- Shortly after the start of the pandemic, on April 6, 2020, SUWA filed its fifth Motion to Intervene (ECF No. 607), which is the motion now before the court.

[5]  This reference to SUWA pertains only to the Southern Utah Wilderness Alliance, and its late entry into R.S. 2477 matters will be addressed further below.

and is arguing for the narrowest width it can under the law.  *See* United States' Proposed Findings of Fact and Conclusions of Law (ECF No. 677).  SUWA's interests have been, and continue to be, adequately represented by the United States in this case.

SUWA also seems to imply that because the Tenth Circuit allowed SUWA to intervene as of right in *Kane County (1)*, this court also must allow SUWA to intervene as of right in this case and, by extension, all other R.S. 2477 cases.  While the court respects the Tenth Circuit's *Intervention Ruling*, SUWA's contention does not appear to be in harmony with it.

Under Tenth Circuit precedent, one panel cannot overrule another panel; nor may a panel overrule an *en banc* ruling.  *Burlington N. & Santa Fe Ry. Co. v. Burton*, 270 F.3d 942, 947 (10th Cir. 2001) (citing *United States v. Morris*, 247 F.3d 1080, 1085 (10th Cir. 2001)) (stating a panel "cannot overrule the judgement of another panel of this court absent en banc reconsideration or a superseding contrary decision by the Supreme Court"); *see also United States v. Goines*, No. 20-3183, 2021 WL 4544098 (10th Cir. Oct. 5, 2021) (citing *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020)) (same).  Because an *en banc* panel has concluded SUWA does not have a *per se* right to intervene in R.S. 2477 cases, the court does not read *Kane County (1)* as establishing a contrary ruling.[6]  Moreover, *Kane County (1)* is distinguishable from this case. Accordingly, the court again denies SUWA intervention as of right.

---

[6]  If the court has misread the *Kane County (1)* decision, such that SUWA now has a *per se* right to intervene in all R.S. 2477 cases, the court invites the Tenth Circuit to so state.  As stated above, SUWA has now moved multiple times to intervene in this case.  Answering the same question repeatedly drains the court's resources.

## BACKGROUND

This court has been assigned *Kane County (1)*, which was filed in 2008, and *Kane County (2)*, which was filed in 2010. Both cases involve R.S. 2477 road issues. In 2013, this court also was assigned to do case management[7] on about twenty other R.S. 2477 cases pending in this district (the "Road Cases"). *See* Case Mgmt. Order (ECF No. 78).[8] Throughout all of this litigation, this court has had interaction with SUWA. It knows of SUWA's actions from the time it first sought to intervene in these R.S. 2477 road cases, which knowledge informs this decision.

## STANDING

### I.   PIGGYBACK STANDING

"'One essential aspect of [a court's jurisdiction] is that any person invoking the power of a federal court must demonstrate standing to do so.'" *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). Thus, "[a]ny party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims" or defenses. *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007). With respect to a person seeking entry as an intervenor, the United States Supreme Court has clarified that "[f]or all relief sought, there must be a litigant with standing. . . . Thus, *at the least*, an intervenor of right must demonstrate Article III standing when it seeks

---

[7]   The next bellwether trial will be in a different case and handled by a different judge in this district. Presently, however, case management on non-substantive matters remains with this court.

[8]   Because Kane County filed its cases before the others, it was on a different path. Consequently, it was not subject to the case management order, but the *Kane County (2)* case number has been listed in captions involving case management orders due to the State of Utah's role.

*additional relief* beyond that which the [original party] requests." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) (emphasis added).

In the *Intervention Ruling*, the majority addressed whether piggyback standing was still permitted, such that SUWA could "'piggyback' upon the standing of [the United States] to satisfy the standing requirement." *Dillard*, 495 F.3d at 1330.  The majority distinguished prior Tenth Circuit and Supreme Court cases, and concluded that piggyback standing is still allowed, as long as an intervenor does not seek relief different from the original party. *Kane County (1)*, 928 F.3d at 886–87.  Because the United States represented in *Kane County (1)* that it was seeking "retention of the maximum amount of property" and "the smallest [road] widths it can based on the historical evidence," the majority concluded SUWA and the United States were seeking the same relief.  *Id.* at 887 (quotations, citations, and alteration omitted).  Accordingly, the majority held that SUWA had satisfied the standing requirements.

Based on the *Intervention Ruling*, as long as SUWA does not seek relief different from the United States, SUWA also has piggyback standing in *Kane County (2)*.

## II.    ARTICLE III – CONSTITUTIONAL STANDING

### A.    Majority's Conclusion in *Kane County (1)*

The majority in the *Intervention Ruling* also concluded that SUWA had "establish[ed] its own independent standing." *Intervention Ruling*, 928 F.3d at 888.  For constitutional standing, a party must show:

> (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury can likely be redressed by a favorable decision.

*Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

The majority found that SUWA had "established an imminent injury" because the plaintiffs in *Kane County (1)* are "seek[ing] to double the width of" two dirt roads and "more than double the width" of a third road.  The majority then concluded:

(1)     "Wider roads will likely require realignments or improvements, such as grading or paving."

(2)     "Such widening and improvement of the roads in a scenic area would almost inevitably increase traffic, diminishing the enjoyment of the nearby natural wilderness," and

(3)     These injuries were not speculative because a project that realigns, widens, and significantly improves a road "accommodate[s] large increases in future traffic"

*Id.* at 888 (quotations and citations omitted).  Each point made by the majority had as its premise that the State and County were seeking to make the roads wider.

A word often is susceptible to multiple meanings in the English language.  It appears that the majority envisioned something different than what is before this court in *Kane County (1)*.  In the underlying *Kane County (1)* case, this court concluded that the scope of the *rights-of-way* for three roads was wider than the travel surfaces of those roads.  *Kane Cnty., Utah (1) v. United States*, No. 2:08-CV-00315, 2013 WL 1180764, at *64–65 (D. Utah Mar. 20, 2013), *rev'd and remanded sub nom. Kane Cnty., Utah v. United States*, 772 F.3d 1205 (10th Cir. 2014).  This court's opinion, however, did not increase the *travel surface* of the three roads.  Instead, the width at issue in the underlying case pertained to the room needed to do the following:

maneuver equipment, repair culverts, clear vegetation, obtain fill, and divert water to *maintain the roads to their present travel surface*.  [Such room] further allows for shoulders along the road for emergency pull-offs and room to address any future realignments or

7

> other improvements needed to increase safety.
> . . .
>
> The court notes again that any such realignments or improvements
> would require consultation with the BLM before they are
> undertaken.

*Id.* at *64 & n.33 (emphasis added).

In *Kane County, Utah v. United States*, 772 F.3d 1205, 1223–24 (10th Cir. 2014), the Tenth Circuit reversed this court's width determination because it concluded the court had failed to base the width determination on pre-1976 uses and had allowed for unspecified future improvements. Upon remand, however, this court will not be determining if the travel surfaces for the three roads should or should not be widened. That issue is not before the court.[9] Instead, the issue is the length and width of the *right-of-way*, which may potentially include a width wider than the travel surface under existing law. Because *Kane County (1)* does not involve widening the travel surfaces of any of the three roads, it is difficult to discern why SUWA is presently facing imminent injury to its environmental interests from purported increased traffic on the roads.

Moreover, any such change to the width of the travel surface constitutes construction activities, and such construction activities must be reviewed by the United States before they commence. *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 748–49 (10th Cir. 2005), *as amended on denial of reh'g* (Jan. 6, 2006). Based on the time for review and outcome

---

[9] Although the State and County, on remand, are seeking for the rights-of-way to be wider than the travel surface, they have reaffirmed in briefing that it is a "false assumption . . . that if Plaintiffs' prevail all roads will be widened by the County and traffic will increase to the point of causing environmental harm." State's Mem. in Opp'n to Mot. to Intervene, at 3 (ECF No. 646). Moreover, widening the travel surface is also not the intent of Plaintiffs in *Kane County (2)*. *See* Kane County's Mem. in Opp'n to Mot. to Intervene, at 6 (ECF No. 649) (affirming in this case that Plaintiffs are not seeking to increase width or traffic on the roads).

of that review, any construction activities are not imminent. Additionally, whenever a NEPA analysis is involved due to a proposed improvement,[10] SUWA has a seat at the administrative table and pursues litigation on its own when it is dissatisfied with an administrative decision. Consequently, the majority's conclusion about SUWA's imminent injury is perplexing.

That said, in *Kane County (2)*, some of the bellwether roads are presently closed, and it is reasonable to infer that if title to any of the closed roads is vested in the State and Kane County, then the road(s) may be reopened. Moreover, reopened roads would lead to increased traffic on those roads. Even though this court disagrees that those factors are enough to establish Article III standing, based on how the majority applied such standing in the *Intervention Ruling*, the court concludes that SUWA has satisfied Article III standing in *Kane County (2)* as well.

## III.   PRUDENTIAL STANDING

Even if SUWA has Article III standing, Kane County contends that SUWA should be denied intervention because it lacks prudential standing. The dissent in the *Intervention Ruling* also addressed the issue and concluded SUWA lacked third-party standing. *Kane County (1)*, 928 F.3d at 901 (10th Cir. 2019) (Tymkovich, C.J., dissenting). The majority did not reach the issue. *Id.* at 886 n.9.

Third-party standing requires one to "'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Id.* at 900 (quoting *Kowalski v. Tesmer*, 543 U.S. 125 (2004)). An exception exists if one can show that it "'has a close

---

[10]   Kane County is seeking review by the United States for approval of a chip seal project on the Skutumpah road. The scope of Skutumpah is still before the court in *Kane County (1)*. Kane County has informed the court it intends to raise that issue in *Kane County (1)*. Because the issue has not been briefed fully, the court lacks details about the project. It therefore cannot address that point here.

relationship with the person who possesses the right *and* there is a hindrance to the possessor's ability to protect his own interests.'" *Id.* (alteration omitted) (emphasis added) (quoting *Sessions v. Morales-Santana*, __ U.S. __, 137 S. Ct. 1678, 1689 (2017)).

In *The Wilderness Society v. Kane County, Utah*, 632 F.3d 1162, 1171 (10th Cir. 2011) (en banc), The Wilderness Society asserted it was "not suing based on the legal rights of a third party, the federal government's property rights, but rather [was] working to protect its conservation interests." (Quotations and citation omitted.)  In response, the en banc panel stated, "[p]rudential standing imposes different demands than injury in fact.  A party may suffer a cognizable injury but still not possess a right to relief." *Id.* (internal citations omitted).  The panel then rejected that "alleged aesthetic or recreational injury" was sufficient to grant The Wilderness Society prudential standing. *Id.* at 1174.  In particular, the panel found that, The Wilderness Society's protests to the contrary, it "obviously seeks to enforce the federal government's property rights in the disputed rights of way" based on the nature of the suit.

The court concludes the same applies here.  SUWA was not the intended beneficiary of the R.S. 2477 or Quiet Title statutes and cannot sue or be sued under either on R.S. 2477 road claims.  Scope, *as it pertains to determining the length and width of an R.S. 2477 right-of-way*,[11] also cannot be raised by SUWA in a separate lawsuit because it would be asserting or defending the

---

[11]   The court emphasizes the above language to define the "scope" at hand because scope also is a word susceptible to multiple meanings.  It has been used in the land use context to determine if a particular use falls with the scope of a right-of-way.  Separate processes exist to address land use issues after title rights are determined.  Whether SUWA may participate in those arenas is a separate standing issue than the one before this court.  Here, the legal right or interest pertains only to ownership of rights-of-way and, if applicable, the legal description ("scope") of those rights-of-way.

rights of another.  SUWA is therefore not asserting its own legal rights and interests as those terms are contemplated for prudential standing.  Moreover, even if one could show a close relationship between the United States and SUWA, which the court is not finding, there is no ground to conclude that the United States is hindered in its ability to protect its own interest.  Thus, the court concludes SUWA lacks prudential standing.

It is unclear, however, what the interplay is between piggyback standing and prudential standing.  The court concludes it does not need to reach the issue because it will not alter the outcome of SUWA's motion to intervene.

## HISTORICAL CONTEXT FOR R.S. 2477 ROADS

Before addressing the elements needed to intervene as of right, it is important to review the historical context that applies to R.S. 2477 roads and to SUWA.[12]  It seems that a brief history of R.S. 2477 is stated in almost every decision involving an R.S. 2477 road.  So often has it been repeated, that one may feel inclined to skip over it or skim it briefly.  Yet, the property rights in R.S. 2477 cases are immersed in the past and may only be understood by placing the rights in historical context.  If one does not carefully consider this context, then erroneous conclusions may be reached.  The court therefore reviews this context anew.

---

[12]  On September 5, 2019, the court issued a memorandum decision that addressed the history of the road cases and how that history informs SUWA's present rights.  Mem. Dec. (ECF No. 549). Because the analysis is still important and applicable to the present motion, the court repeats much of it here and supplements it with additional facts and legal analysis to address SUWA's latest motion.

## I.      R.S. 2477 ROADS WERE WELCOMED AND NEEDED

The United States wanted to settle the west in the 1800's.  Consequently, after the United States had expanded its boundaries to the Pacific Ocean, Congress passed a series of acts to encourage such settlement and development of the west.  Among these were the Homestead Act of 1862 (granting lands for settlement), the Pacific Railway Act of 1862 (supporting development of a transcontinental railroad by granting lands), and the Morrill Act of 1862 (promoting development of public colleges by granting lands).  Against this backdrop, "[i]n 1866, Congress passed an open-ended grant of 'the right-of-way for the construction of highways over public lands, not reserved for public uses.'"  *S. Utah Wilderness All.*, 425 F.3d at 740 (quoting Mining Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253 (1866), *repealed by* Federal Land Policy Management Act of 1976, Pub. L. No. 94-579, § 706(a), 90 Stat. 2743)).  Such highways are now commonly referred to as R.S. 2477 roads, and "most of the transportation routes of the West were established under [R.S. 2477's] authority."  *Id.*  Indeed, "R.S. 2477 rights of way were an integral part of the congressional pro-development lands policy," and were "deemed a good thing."  *Id.* at 740–41.  The roads were welcomed and needed to carry out the United States' desire to settle the west.

For the 110-year-period between 1866 and 1976, the grant for the creation of highways remained in place until Congress passed the Federal Land Policy Management Act of 1976 ("FLPMA").  Although Congress changed its focus in 1976 to conservation and preservation, FLPMA nevertheless provided "that any valid R.S. 2477 rights of way existing" at the time of FLPMA's passage "would continue in effect."  *Id.* at 741 (quotations omitted) (citing Pub. L. No. 94-579, § 701(a), 90 Stat. 2743, 2786 (1976)).

The court takes judicial notice that Kane County was founded in 1864 while Utah was still a territory.  It was formed in the midst of the Acts discussed above to settle the west and establish roads across public lands.  It would be illogical to conclude that no R.S. 2477 roads were established between 1866 and 1976 in Kane County.  Kane County therefore has a legitimate interest in protecting any valid property rights it acquired during that time period.[13]  Unfortunately, what "used to be a non-issue" with respect to these roads has now "become a flash point." *Id.* at 742.  This action arises due to FLPMA's grandfathering provision and ensuing disputes.

## II.    ROADS EXISTING ON THE GROUND AS OF 1976

Because FLPMA grandfathered in existing property rights, Plaintiffs' suit is not about establishing new roads across public lands.  It is about proving who the owner is of roads that *already exist on the ground*, as well as the scope of any existing right-of-way.  For the State and County to prove they acquired these roads before FLPMA's passage, courts have required Plaintiffs to file a quiet title action under 28 U.S.C. § 2409a.

For a cause of action to lie under § 2409a, Plaintiffs must prove "(1) the United States 'claims an interest' in the property at issue; and (2) title to the property is 'disputed.'" *Kane Cnty., Utah*, 772 F.3d at 1210–11 (citation omitted).  If Plaintiffs can pass that jurisdictional bar, they then must prove acceptance of the grant typically by public use or by mechanical means prior to

---

[13]    It would be equally illogical to conclude that Kane County holds title to all 770 claims (approximately) it has made in its consolidated complaints.  Thus, the United States has a legitimate interest in protecting its ownership of property rights that were retained and are exclusive to it.  The parties recognize these truths and are seeking to sort out legal principles through a bellwether process that will guide the resolution of future roads in accordance with rights of the legitimate owner of the right-of-way.

October 21, 1976.  The court makes the distinction between title arising under R.S. 2477 and title arising in another context.

The court references School and Institutional Trust Lands ("SITLA parcels") to illustrate this distinction.  SITLA parcels are owned by the State of Utah.  Some of the SITLA parcels are located within federal preservation areas.  To ensure the State can make use of its SITLA parcels and that the BLM can maintain its priority preservation areas, at times, the State and the United States have entered into exchanges of property.  One of the more recent exchanges occurred under the Utah Recreational Land Exchange Act of 2009.  *See* Pub. L. No. 111-53, 123 Stat. 1982 (2009). It involved a present-day conveyance of title to parcels from one government to another in exchange for a corresponding conveyance of title to other parcels.  The very nature of that title and scope exchange necessitated complex environmental analyses and cost studies before the exchange could be put into effect.  One would anticipate competing interests being evaluated under such circumstances.

In contrast, R.S. 2477 issues do not involve the present day.  They look to events that had to have occurred before October 21, 1976.  No matter how vehemently a person may oppose a road in a certain area today, or how justified that vehemence is, those factors are irrelevant to the court's analysis.  When determining title under R.S. 2477, the court does not consider anyone's present *interest* in land use issues or management, much less anyone's *competing interests*.  Kane County is a hotbed for competing land interests.  For every group that wants to preserve land, there is a competing group that wants the land open for development or recreation.  Such competing interests cannot and do not inform the court's decision about who holds title to the property when that title arises under R.S. 2477.  The specific R.S. 2477 title issue is simply not open for public

opinion or comment.  Thus, the nature of the particular property dispute before the court informs whether SUWA has a right to participate in this action.

## III.     SCOPE IN THE R.S. 2477 CONTEXT

### A.     Scope of Review in *San Juan County*

In another R.S. 2477 road case, "[s]everal conservation groups . . . [sought] to intervene in a federal quiet-title action brought by San Juan County, Utah, against the United States," and other federal defendants.  *San Juan County*, *Utah v. United States*, 503 F.3d 1163, 1167 (10th Cir. 2007) (en banc) (hereinafter "*San Juan*").  The conservation groups were collectively referred to as SUWA.  *Id.*  The district court had denied SUWA's application to intervene as of right and also denied SUWA permissive intervention.  *Id.* at 1171.  The district court stated, "the pleadings define the case in a very narrow fashion and the existence or non-existence of a right-of-way and *its length and its breadth* are matters which it seems to me are fact driven . . . . " *Id.* (citation omitted).  After quoting this particular language, the *San Juan* en banc panel stated, "SUWA appeals this ruling."  *Id.*  Thus, the issue of title and scope were reviewed in the *San Juan* case and SUWA was nevertheless denied intervention.

### B.     Ownership and Scope

In the *Intervention Ruling*, the majority agreed "that scope is inherent in the quiet title process.  After all, a right-of way must have a scope."  *Kane County (1)*, 928 F.3d at 894 (quotations and citation omitted).  It further stated, "the district court must determine title and scope in separate steps."  *Id.*  Judicial efficiency does counsel against reaching the issue of scope if ownership of a right-of-way has not been established, but evidence on both issues is typically presented in the same trial and without bifurcated proceedings.  This is so because ownership and

scope are the two sides of the same coin that comprises title.  Thus, when this court refers to title, it encompasses both elements.

Scope, in the R.S. 2477 context, means defining the length and width of the right-of-way so that the dividing line between one property and another is known.  Indeed, in *Jeremy v. Bertagnole*, the Utah Supreme Court stated it is "proper *and necessary* for the court in defining the road to determine its width, and to fix the same according to what was reasonable and necessary, under all the facts and circumstances, for the uses which were made of the road."  116 P.2d 420, 423 (Utah 1941) (quotations and citations omitted) (emphasis added).

Although width is not limited to the actual travel surface (i.e., the "beaten path"), it is still bounded by pre-1976 uses.  *Id.* at 423–24.  The Court explained the boundaries as follows:

> A particular use having been established, such width should be decreed by the court as will make such use convenient and safe.  A bridle path abandoned to the public may not be expanded, *by court decree*, into a boulevard.  On the other hand, the implied dedication of a roadway to automobile traffic is the dedication of a roadway of sufficient width for safe and convenient use thereof by such traffic.

*Id.* at 424 (emphasis added).

The above confirms pre-1976 events fix in place the type of road that may be had and an approximate boundary for that road.  R.S. 2477 and the Quiet Title Act, § 2904a are the sole statutes that govern the ownership and scope determinations.  Other statutes that require balancing competing land use issues are not in play.

## IV.   HOW SUWA FITS INTO THE R.S. 2477 CONTEXT

Notably, even though this case is about title, SUWA is not a property owner.  Unlike the original parties, SUWA has no claim of title to any of the roads at issue or even to the land on which the roads cross.  This is significant because, based on historical events, all of the federal

land in which SUWA claims an environmental interest is subject to existing R.S. 2477 property rights.  Whatever protectable interest SUWA may have, it emerged subject to those R.S. 2477 interests and cannot encroach upon them.

When Presidential Proclamation 6920 was issued to establish the Grand-Staircase-Escalante National Monument, it "expressly preserved all valid existing rights-of-way" within the Monument.  *Kane County, Utah v. U.S.*, 934 F. Supp. 2d 1344, 1351 (D. Utah 2013), *affirmed in part and rev'd in part on other grounds*, 772 F.3d 1205 (10th Cir. 2014).  When the Monument's management plan was developed, it stated:

> If claims are determined to be valid R.S. 2477 highways, the Approved Plan will respect those as valid existing rights. . . . Nothing in this Plan alters in any way any legal rights the Counties of Garfield and Kane or the State of Utah has [sic] to assert and protect R.S. 2477 rights, and to challenge in Federal court or other appropriate venue any BLM road closures that they believe are inconsistent with their rights.

*Wilderness Soc'y*, 632 F.3d at 1166 (alterations in original) (quoting Monument's Management Plan).

When FLPMA was passed, it directed the Secretary of the Interior to inventory federal lands to determine areas that were roadless and had wilderness characteristics.[14]  *Kane Cnty., Utah*, 772 F.3d at 1216.  When the Secretary designated a land as a wilderness study area ("WSA"), the Secretary then had "to manage such lands 'in a manner so as not to impair the suitability of such areas for preservation as wilderness,' and to 'take any action required to prevent unnecessary or undue degradation of the lands and their resources.'"  *Id.* (quoting 43 U.S.C. § 1782(c)).

---

[14]  This was in harmony with the Wilderness Act of 1964 that sought to preserve wilderness areas containing at least five thousand areas of land.  Pub. L. No. 88-577, 78 Stat. 890 (1964).

As stated above, however, FLPMA also required that all valid R.S. 2477 rights-of-way be grandfathered in and preserved for those who acquired them before October 21, 1976.  The BLM reconciled these competing aspects of FLPMA by stating "roadless" areas for purposes of a WSA involve "roads" that are "not coterminous with a 'road' under R.S. 2477."  *Id.* "[T]he BLM Director for Utah issued" the following clarification:  "The wilderness inventory process uses a definition of a road that is distinct from the definition of 'public' road contemplated by R.S. 2477 (43 U.S.C. § 932) and is a definition for inventory purposes only, not for establishing rights of counties, etc. . . ."  *Id.* (quoting Instruction Memorandum No. UT '80-240 (Mar. 6, 1980)).

Moreover, "[a] subsequent nationwide BLM memorandum stated that where WSAs overlap with R.S. 2477 rights-of-way, 'the WSA/wilderness designation *is subject to* the terms and conditions of the pre-existing R/W grant.'"  *Id.* at 1216–17 (emphasis added) (quoting Instructional Memorandum No. 90-589 (Aug. 15, 1990)).  In each of the above instances, either Congress, the President, or the BLM balanced interests when setting forth the interplay between R.S. 2477 rights-of-way and any competing environmental considerations.  And in each instance, the competing policy, economic, political, and environmental factors all are subject to valid, existing R.S. 2477 rights-of-way to such a point that they are not even considered in the R.S. 2477 analysis.

Perhaps this is better understood when one realizes that, at the time the R.S. 2477 roads were being established, the wilderness study areas that the BLM now manages in Kane County did not exist.[15]  The Grand-Staircase-Escalante National Monument likewise did not exist at the

---

[15]   Although the Wilderness Act of 1964 had already been passed, and Roadless Review Areas were under review, the Wilderness Act did not involve lands managed by the BLM.  FLMPA altered that, and wilderness study areas became a focus post-1976 for BLM managed land.

time.[16]  In fact, SUWA did not exist at the time R.S. 2477 roads were being established.[17]  And no other defendant-intervenor in this action ever litigated the status of any road against Kane County or the State of Utah before 1976, as to whether a road should be opened, closed, or otherwise.  *S. Utah Wilderness All.*, 425 F.3d at 741 (stating "all pre–1976 litigated cases involving contested R.S. 2477 claims (and there are dozens) were between *private landowners* who had obtained title to previously-public land and would-be road users who defended the right to cross private land on what they alleged to be R.S. 2477 rights of way") (emphasis added)).  Only after any R.S. 2477 title had vested, did these things come into play.  Hence, it is not surprising that whatever protectable interest SUWA has, the interest was taken subject to the title holder's interests, not the other way around.

With the historical context in mind, the court now turns to the elements needed to intervene as of right.

## INTERVENTION AS OF RIGHT

Rule 24(a) of the Federal Rules of Civil Procedure sets forth the conditions for intervention as of right.  SUWA must (1) "claim[] an interest relating to the property or transaction that is the subject of the action," and (2) be "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless [3] existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).

---

[16]   The court takes judicial notice that the Monument was established in 1996.

[17]   This particular reference to SUWA refers only to the Southern Utah Wilderness Alliance, and the court takes judicial notice SUWA was formed in 1983.

I.  **INTEREST RELATING TO PROPERTY AND IMPAIRMENT OR IMPEDIMENT OF THAT INTEREST**

Intervention law has been inconsistently interpreted by the circuits, and unfortunately, the United States Supreme Court has provided little guidance about the "interest" prong for intervention as of right.   Again, historical events are informative.   Rule 24 was substantially modified in 1966, and that version is largely what is before the court today.   The 1966 Advisory Committee Note specified how the amended rule was to be applied.   Rule 24(a) was meant to follow "the reasoning underlying" Rules 19 and 23.   Fed. R. Civ. P. 24(a)(2) advisory committee's note to 1966 amendment.   The Committee stated, "[i]ntervention of right is here seen to be a kind of counterpart to Rule 19(a)(2)(i)[18] on joinder of persons needed for a just adjudication."   *Id.*   It also stated, an applicant should be allowed "to intervene in an action when his position [was] comparable to that of a person under Rule 19(a)(2)(i), as amended, unless his interest [was] already adequately represented in the action by existing parties." *Id.*   Rules 19 and 24 share almost identical language because of their design to work in tandem.   Nelson, 106 Va. L. Rev. at 334, 355.

Although "practical considerations" were incorporated into Rules 19 and 24, the concern at issue was the "legally protected interests of the sort that might form the basis for a lawsuit, not simply practical interests that might make someone care about the outcome of the suit."   Nelson, 106 Va. L. Rev. at 334; *see also* 6 Moore's Federal Practice - Civil § 24.03 (2022) (stating "the term *protectable* means legally protectable.   A movant's interest must be 'direct, substantial, and legally protectable' to satisfy the interest requirement of Rule 24(a)(2).") (emphasis in original)).

---

[18]  This rule has since been renumbered to Rule 19(a)(1).

In 2007, however, the *San Juan* en banc panel concluded it would no longer follow the "direct, substantial, and legally protectable" standard. *See San Juan*, 503 F.3d at 1193, 1195, 1199 (stating it is not legal error to consider those factors, "[b]ut other interests may also suffice"). Instead, the Court adopted the "practical judgment" standard that "must be applied in determining whether the strength of the interest . . . justif[ies] intervention." *Id.* at 1199. Although one would be hard pressed to conclude that SUWA is a necessary party in R.S. 2477 proceedings,[19] by changing the intervention standard, the panel essentially decoupled Rule 24 from Rule 19. The panel then concluded that "SUWA's environmental concern is a legally protectable interest," and that the disposition of the R.S. 2477 claims in *San Juan* "may as a practical matter impair or impede SUWA's ability to protect that interest" based on the facts of that case. *Id.* (quotations, citation, and alteration omitted).

The panel relied upon a movement that "can be traced to the 1960s and 1970s." Nelson, 106 Va. L. Rev. at 337. "[A] trio of judges on the D.C. Circuit—David Bazelon, Harold Leventhal, and Spottswood Robinson—issued two opinions that paved the way for a broad reading" of Rule 24. *Id.* at 351. The *Nuesse v. Camp*, 385 F.2d 694 (D.C. Cir. 1967) decision is one of the opinions, *id.* at 352, and the Tenth Circuit panel relied, in part, on that decision when it altered its intervention standard. *See San Juan*, 503 F.3d at 1198.

"Chief Judge Bazelon urged courts not 'to be led astray by a myopic fixation upon "interest," but instead to interpret Rule 24(a) so as to achieve the goal of disposing of lawsuits by involving as many apparently *concerned persons* as is compatible with efficiency and due

---

[19] Such a finding would be contrary to every Tenth Circuit decision where the Court affirmed that SUWA had no legal right to participate in an R.S. 2477 case.

process.'"  Nelson, 106 Va. L. Rev. at 355 (alteration omitted) (emphasis added) (quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969), which in turn quoted the *Nuesse v. Camp* decision). The D.C. Circuit's interest-based representation allowed for a "surrogate political process" to be had "within lawsuits." *Id.* at 369.  It also opened the door for the liberal intervention standard that the Tenth Circuit now follows after *San Juan*.  This court understands the concerns expressed in *San Juan*.  But when such concerns run contrary to the stated purpose of a rule, and the corresponding modified standard works harm to the original parties, the concerns should give way.

Although the *San Juan* decision altered the intervention standard, the reasoning the panel applied to conclude SUWA satisfied the "interest" prong was still "highly fact-specific."  *San Juan*, 503 F.3d at 1199 (citation omitted).  When making its finding, the panel expressly noted SUWA had brough an earlier suit, and "the litigation [in *San Juan*] proceed[ed] *directly* from SUWA's earlier advocacy of its interest."  *Id.* at 1168, 1199 (emphasis added).  Moreover, the panel cautioned that (1) Rule 24(a) should not be applied mechanically; (2) "courts [must] exercise judgment based on the specific circumstances of the case;" (3) "one must be careful not to paint with too broad a brush in construing Rule 24(a)(2);" (4) "[t]he law can develop only incrementally;" and (5) the panel could not "produce a rigid formula that will produce the 'correct' answer in every case."  *Id.*

Although this case involves some closed roads, *Kane County (2)* does not flow directly from an underlying proceeding like the one in *San Juan*.  SUWA has engaged in widespread litigation challenging land use plans and has advocated for road closures, but to generalize that litigation to the point that every R.S. 2477 case flows from SUWA's advocacy would not be in harmony with the particular application in *San Juan*.  Accordingly, this case is distinguishable

22

from *San Juan*.  Arguably, were one to apply the pronouncements from *San Juan*, there could be multiple points on which this case would be distinguished from it.

Yet, it appears the Tenth Circuit has now reached a de facto rule for R.S. 2477 cases whereunder SUWA will always satisfy the "interest" prong for intervention as of right because SUWA has a "decades-long history of advocating for the protection of these federal public lands." *Kane County (1)*, 928 F.3d at 892.[20]  The de facto rule, however, does not appear to take into account that such advocacy occurred in the land use arena, which arena has no application in R.S. 2477 cases.  In fact, it would be improper for this court to take into account land use issues when deciding ownership and scope under R.S. 2477 and the Quiet Title Act.

While this court finds the Tenth Circuit's decoupling of Rule 24 from Rule 19 problematic—particularly since the 1966 Advisory Committee Note is still applicable—and is concerned about the majority's conclusions about SUWA's interests, the court nevertheless assumes that SUWA has satisfied Rule 24(a)'s "interest" prong.

## II.     ADEQUATE REPRESENTATION OF INTERESTS

### A.     SUWA's Converging Interests with the United States

"Even if an applicant satisfies the other requirements of Rule 24(a)(2), it is not entitled to intervene if its 'interest is adequately represented by existing parties.'"  *Kane County, Utah v. United States*, 597 F.3d 1129, 1133–34 (10th Cir. 2010) (quoting Fed. R. Civ. P. 24(a)(2)) (other citation omitted).  SUWA contends the United States cannot adequately represent its interest

---

[20]  The majority relied on that factor and what seems to be a factual error about what would happen to the travel surface of the roads in *Kane County (1)*.  Nevertheless, because rights-of-way wider than the roads' travel surfaces are in play in every one of the R.S. 2477 Road Cases, if these factors are sufficient to establish "interest," we are then at a de facto rule.

because of a line of cases that state, "the government is obligated to consider a broad spectrum of views, many of which may conflict with the particular interest of the would-be-intervenor." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1256 (10th Cir. 2001).  In such situations, only a minimal burden must be met to show inadequacy of representation. *See id.* at 1254–55 (citations omitted).  It is that same line of cases the majority applied in the *Intervention Ruling*.  Based on those land use cases, the majority concluded the United States would be considering competing policy, economic, political, legal, and environmental factors in *Kane County (1)* on the issue of scope. *See Kane County (1)*, 928 F.3d at 893–94.

In the United States' Response to SUWA's Supplemental Brief on Intervention as of Right in this case, it stated that it "does not concede that in [*Kane County (2)*] questions of scope will involve 'policy, economic, political, legal, and environmental factors'" (collectively "the Environmental Factors").  Resp. to SUWA's Supp. Brief, at 3–4 (ECF No. 709).  The United States' response is not surprising because none of those factors are in play in *Kane County (2)*.

This court is the fact finder in *Kane County (2)*.  It is aware of the record and the trial testimony.  Extensive post-trial briefing has been submitted.  Unlike in *Kane County (1)*, no additional evidence is being taken on the issue of scope in *Kane County (2)*.  Thus, the court is aware of what is now before the court.  And in none of the foregoing were the Environmental Factors raised or balanced by the United States because those factors are outside of the parameters of the R.S. 2477 and the Quiet Title Act analysis.  Moreover, this court has observed that the United States has chosen to defend title (i.e., ownership and scope) vigorously on every bellwether road in *Kane County (2)*.

The federal government is not always legally obligated to consider a broader spectrum of views. That obligation only arises when it is "litigating on behalf of the general public," *Utah Ass'n of Counties*, 255 F.3d at 1256, or when statutory obligations impose a duty on the government "to serve two distinct interests, which are related, but not identical." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 (1972). The very nature of the legal analysis and evidence shows the distinction between when the United States is litigating on behalf of other and when it is representing only its interests.

When this court has reviewed land use cases, the Environmental Factors are in play. For the United States to show its actions were appropriate in the land use context, it has to show what consideration it gave to competing views on the impact of an improvement project, or a travel plan, or a land management plan, and so forth. The United States has to show how it balanced those interests and any applicable environmental evidence in such a manner that its decision was not arbitrary, capricious, or contrary to law.

In an R.S. 2477 action, however, the United States does not have to present any evidence about impact on the environment or how it balanced competing interests when defending title. It does not have to offer evidence about how it has chosen to defend title. Nor are the decisions by the United States subject to challenge as being arbitrary and capricious or contrary to law because the only interest in play is its own.

In situations where the federal government is not representing interests other than its own, then the "representation is *adequate* when the *objective* of the applicant for intervention is identical to that of one of the parties." *City of Stilwell, Okl. v. Ozarks Rural Elec. Co-op. Corp.*, 79 F.3d 1038, 1042 (10th Cir. 1996) (quotations and citations omitted) (first emphasis in original) (second

25

emphasis added).  The same remains true even if the intervenor's "ultimate motivation" in an action is different from the original party.  *Id.*

In this case, the United States is not litigating to protect the general public's rights.  It is litigating to protect its own exclusive title to property.  It is a landowner that does not want its property rights encumbered by a right-of-way owned by Kane County or the State.  Moreover, there is no statutory provision that requires the United States to consider any other competing interests but its own in this dispute.

As this court has held already on multiple prior occasions in this case, SUWA's objectives and interests in this litigation are the same as the United States.  Both seek to defeat Plaintiffs' claims to title, and if title is found in favor of Plaintiffs for any road, both seek for that right-of-way to be as narrow as possible.  In this, the United States and SUWA's objectives and interests are harmonious.  Although the two may have diverging views about how to oppose Plaintiffs' claims, any interests SUWA may have are still *adequately* represented by the United States.

This is true regardless of whether the court is determining who is the owner of the right-of-way or the scope of that right-of-way.  The scope determination does not weigh if a road should be open or closed to vehicular travel.  The past use determines the type of road.  It does not weigh if it is adjoined by a wilderness study area.  Those areas were taken subject to the right-of-way.  It does not involve a NEPA analysis or any other environmental or cost analysis because any dedication has to have occurred prior to 1976.

Through all of this, the United States has asserted it intends to argue for the narrowest width possible if any right-of-way is established in Plaintiffs' favor, and certainly, the United States has not acted contrary to its representations.  During a three-week bench trial, the United

States, through multiple attorneys, presented a strong defense to Plaintiffs' claims.  In its post-trial briefing, the United States seeks dismissal of every bellwether road in this case on jurisdictional grounds, and to the extent jurisdiction is found, the United States has not conceded title to a single road.  SUWA can ask for no more.  Based on the parameters of how scope of title is determined and the United States' representations, the court concludes SUWA's interests are adequately protected by the very entity who owns the land and who has been involved with it for more than 150 years.

### B.      Changes in Presidential Administrations

The court now turns to the issue of Presidential Administrations.  When SUWA went before the Tenth Circuit for the third time in *Kane County (1)* on the issue of intervention, it relied heavily on the Trump administration coming into office to argue the United States would not represent SUWA's interests adequately.  As the dissent stated in the *Intervention Ruling*, at times "a shift in government policy may be enough to upset the presumption of adequate representation" in the land use context.  *Kane Cnty. (1)*, 928 F.3d at 904.  R.S. 2477 cases, however, span many presidential terms of office.  Because of how many times a change may occur over who is in office, allowing such a change to affect when intervention may occur and when it may not will wreak further havoc on an area of law that already is problematic.

As this court stated in its September 5, 2019 ruling,

> By the time this case reaches trial, has post-trial briefing, and a written ruling, we likely will be past the 2020 elections.  That is how complex this case is.  Speculating about what effect the Trump administration may have during an election year, and further speculating that he will be re-elected and focus on the R.S. 2477 cases is just that—speculation.

*Kane Cnty., Utah*, 333 F.R.D. at 934 F. Supp. 2d at 237.  That has proven to be correct.

Moreover, in the same ruling, this court noted that "Ken Salazar, who served as the United States Secretary of the Interior during the Obama administration, issued a memorandum in 2010, that clarified the United States' policy about R.S. 2477 roads." *Id.* The memorandum "stated the Secretary was working towards a pilot project to negotiate resolution of the R.S. 2477 claims in Utah."[21] *Id.* "If the United States can work towards that solution under the Obama administration, then working towards such a solution under Trump administration [was] not a sea change." *Id.*

In its Fifth Motion to Intervene in this case, SUWA also initially argued that its interests would not be adequately represented because the Trump administration had been lenient in allowing an application for a recordable disclaimer of interest ("RDI") and it had decreased the size of two national monuments in Utah. No RDI, however, was at issue in Kane County. Moreover, even though the monument sizes had changed, it did not remove the lands from federal ownership and control under the BLM land management.

Additionally, what has occurred since "President Joseph Biden was inaugurated on January 20, 2021 ("Inauguration Day")," further undermines SUWA's argument. Plaintiffs' Joint Opp'n to SUWA's Supplemental Brief, at 6 (ECF No. 708).

> On Inauguration Day, Scott de la Vega, Acting Secretary of the Interior for the Biden Administration, signed Order No. 3395, which, among other things, temporarily suspended all delegations of authority to Department Bureaus and Offices to issue any final decision with respect to R.S. 2477 claims, including recordable disclaimers of interest. *See* Order No. 3395, at Sec. 3.e. Although set to expire 60-days from its execution, its effects [were] extended indefinitely [on March 19, 2021].

---

[21] Press Release, July 30, 2010 at https://www.doi.gov/news/pressreleases/Salazar-Lays-Groundwork-for-Utah-Pilot-Project-to-Resolve-Old-Road-Claims-on-Public-Land (last visited Sept. 5, 2019).

> . . . Also on Inauguration Day, President Biden ordered a sixty-day review of former President Trump's 2017 boundary changes to national monuments, which included size reductions of both Grand Staircase-Escalante and Bears Ears in Utah.  *See* Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (dated January 20, 2021), at Section 3; *see also* Exec. Order No. 13990, 86 Fed. Reg. 7037 (2021).  The sixty-day review leaves open a range of options for the Biden Administration, but there is a strong likelihood that both of Utah's affected national monuments will be expanded well beyond the boundaries redrawn by the Trump Administration in 2017.  *See, e.g.*, Brian Maffly, *President Joe Biden's order to review Utah monuments leaves options open, but expansion all but certain*, SALT LAKE TRIBUNE (Jan. 25, 2021), available at https://www.sltrib.com/news/environment/2021/01/25/president-joe-bidens/.

> . . . On January 27, 2021, President Biden signed an Executive Order described by the Biden Administration as a means to "help restore balance on public lands and waters and provide a path to align the management of America's public lands and waters with our nation's climate, conservation, and clean energy goals." *See* Exec. Order No. 14008, 86 Fed. Reg. 7619 (2021).  Section 208 of this Executive Order directs the U.S. Department of Interior ("DOI") to pause all new oil and gas leasing on public lands and offshore waters, concurrent with a comprehensive review of the federal oil and gas program as a whole.  *See id.* at 7624.  Additionally, Section 216 directs DOI to outline steps to conserve at least thirty percent each of U.S public lands and waters by the year 2030.  *See id.* at 7627.

*Id.* at 6– 7 (cleaned up).  Thus, the grounds relied on by SUWA are no longer at issue.

## C.    Other Relevant Point on Adequacy of Representation

The court makes one final note.  To the extent SUWA is contending the United States does not represent it adequately because the United States is not turning over every rock or making every possible argument, or because it may possibly disclaim or settle a claim, the court refers SUWA to Rule 1 of the Federal Rules of Civil Procedure.  Rule 1 states all of the civil rules

(including those pertaining to discovery and intervention) are to "be construed, administered, and employed by the court *and* the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1 (emphasis added).  If a party has a litigation tactic that contravenes Rule 1, and one is balancing interests under the practical effects standard for intervention, that tactic should not be used to justify intervention but to halt it.  To do otherwise is to ignore the very problem Rule 1 seeks to address.  Based on the forgoing, the court concludes SUWA does not have a right to intervene in this case.

## III.    SUWA'S END GOAL

Although the court has concluded that SUWA does not have a right to intervene, SUWA's end goal warrants its own discussion.  SUWA has made clear that it is not trying to intervene merely to defend the United States' title to the roads.  Instead, SUWA's "focused interest in land protection" is such that it desires for "*any* right of way be *closed to vehicular traffic*," within the R.S. 2477 context.  Renewed Mot. to Intervene, at 13, 16 (ECF No. 410) (emphasis added).[22]  The Tenth Circuit's intervention standard requires that "practical judgment . . . be applied in determining whether the strength of the interest and the potential risk of injury to that interest justify intervention."  *San Juan*, 503 F.3d at 1199.

In light of the fact that SUWA did not come into existence until seven years after any title had to have vested in the roads at issue, and that none of the other conservation groups involved in this case opposed title vesting when any such roads were dedicated to public use, the permissive intervenors' present position to shut down every R.S. 2477 road to vehicular use shows a troubling

---

[22]    To the extent SUWA is seeking relief differently from the United States, it lacks prudential standing to do so.

disregard for the property rights of others.  Moreover, it shows that any interest they have is an after-the-fact creation.

Furthermore, SUWA's (in its collective status) desire to shut down R.S. 2477 roads disregards the impact such an action would have on rural communities.  If successful, SUWA's action would have the practical effect of precluding those with physical limitations from enjoying the beauties of Kane County because they lack the stamina to hike into an area having no roads. Given such detrimental impacts, SUWA's end goal is concerning.

Ironically, one could argue that roads help keep Kane County pristine.  Roads keep various forms of transportation on a designated path so that the land adjoining them may remain undisturbed by vehicular traffic.  For now, though, SUWA cannot use this case to reach its end goal.

## LIMITED AND DISCRETIONARY PERMISSIVE INTERVENTION

SUWA is a limited permissive intervenor in this case.  Restrictions have been placed on SUWA's role to ensure manageability of the case and a fair process for the original parties.  The restrictions have been detailed in different permissive intervention orders.  On September 9, 2019, the court issued a Fourth Amended Permissive Intervention Order (ECF No. 550) in this case and the other R.S. 2477 road cases.  For reasons discussed below, that order further limited SUWA's role in this case.

Recently, SUWA has moved in one of the other R.S. 2477 cases to lift the restrictions and return to the Third Permissive Intervention Order.  *See* Mot. to Return (ECF No. 160 in Case No. 2:12-cv-452).  Based on statements made in a motion and the court's ruling above, the court has reason to believe SUWA will seek for the same relief in this case and other similar R.S. 2477 road

31

cases. Mot. for Leave to File Mot. to Return, at 2 (ECF No. 724) ("SUWA intends to file a single omnibus motion in this case seeking to return to the Third Permissive Intervention Order in *all* R.S. 2477 cases currently operating under the Fourth Permissive Intervention Order") (emphasis added)). Accordingly, the court addresses here whether the restrictions on SUWA's role should be lifted. And similar to past decisions, this ruling will apply in all cases to which the Fourth Amended Permissive Intervention Order now applies.

## I.     BACKGROUND

SUWA has no claims or defenses that it can raise under R.S. 2477 or the Quiet Title Act. Any defenses it may wish to raise are defenses of the United States and not its own. Despite this fact, at a global hearing on intervention in the R.S. 2477 road cases, SUWA had "at least 18 lawyers from national and international firms," present "as well as experienced local attorneys who have been retained and [would] apply the resources necessary *to properly defend* this case." Hearing Tr., at 25 (ECF No. 93 in Case No. 2:11-cv-1045) (emphasis added). It informed the court "[w]e intend to litigate [the R.S. 2477 cases] aggressively using every resource available to us." *Id.* at 77.

While the court appreciated SUWA's candidness in that moment, it was clear SUWA had the intent to take a lead role in this litigation. A lead to which it had no right to take.[23] A lead that could well harm the original parties who do have a right to be before the court.

---

[23]  At the time of the global hearing, the Tenth Circuit had affirmed this court's decision that SUWA could not intervene as of right in *Kane County (1)* because the United States would adequately represent its interests. *See Kane County v. United States*, 597 F.3d 1129 (10th Cir. 2010). The Tenth Circuit had also affirmed the denial of SUWA's motion to intervene as of right in another quiet title action three years before that. *See San Juan*, 503 F.3d at 1167. The court saw no substantive difference in the adequacy of representation in *Kane County (1)* and the other R.S. 2477 cases pending before the court.

When considering whether a party may permissively intervene, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Based on SUWA's representations and show of its litigation team, the court concluded, "[i]f SUWA were allowed to intervene, without *strict limitations*, . . . this case would become 'fruitlessly complex or unending,' to the prejudice of the parties." *Sevier County v. United States*, No. 2:12-cv-452, 2013 WL 2643608, at *4 (D. Utah June 12, 2013) (emphasis added) (citation omitted); *Kane County (2)* Order, at 2 (ECF No. 181) (adopting same reasoning for conditions stated in *Sevier County*).

SUWA, however, had represented at the global intervention hearing that it had access to evidence that the federal government did not have. Hearing Tr., at 25 (ECF No. 93 in Case No. 2:11-cv-1045). The court was persuaded that if SUWA did have such evidence, then it could be a backstop to the United States.[24] To ensure SUWA acted only as a backstop, and not as a lead to the detriment of the original parties, the court set specific conditions on SUWA's participation. It

---

[24] In relation to SUWA's Fifth Motion to Intervene, the court asked SUWA to detail what additional evidence it would have presented at trial on the issue of scope. SUWA responded that it would have presented its own aerial imagery expert. Mot. to Intervene, at 24 (ECF No. 607). SUWA admits that the United States presented such an expert who was qualified. *Id.* The United States' expert looked at aerial imagery from 1953, 1974, and 2016. *Id.* SUWA's expert, however, also looked at imagery from the 1960's, but SUWA has failed to show or explain how that altered the analysis presented by the United States about whether a road was present or not. *Id.* SUWA only asserted that its expert engaged in a nuanced analysis to show the degree that the road was present. *Id.* at 24. The court can tell the nuanced degree, however, from the evidence presented by the United States. Finally, SUWA asserts it had an expert historian who could have discussed federal regulations and their practical implementation on such things as range improvements. *Id.* at 26. To the extent such testimony would have been permissible, and not improper testimony on legal conclusions, the United States also presented testimony from an expert historian who addressed range improvement projects and other similar historical information. Thus, SUWA's evidence merely shows how well-prepared the United States was in its defense and that it vigorously pursued and presented the same type of evidence that SUWA did.

did so based on its discretionary authority and in aid of the "efficient conduct of the proceedings." *United States v. Albert Inv. Co., Inc.*, 585 F.3d 1386, 1396 (10th Cir. 2009) (quotations omitted) (citing *San Juan*, 503 F.3d at 1189; *Beauregard, Inc. v. Sword Servs., LLC*, 107 F.3d 351, 352–53 (5th Cir. 1997) ("It is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right.")).

From the time the court placed limitations on SUWA's role, SUWA has bristled over the restrictions and sought to thwart them so it could take the lead and act as a full party. Its actions have hindered the resolution of these proceedings to the actual detriment of the original parties. When a *limited permissive* intervenor's rights and actions surpass that of the original parties, something is wrong, and the course needs to be corrected. The court now turns to just a few examples of SUWA's conduct in the R.S. 2477 proceedings.

## I.    CONDITIONS PLACED BY COURT

### A.    Claims and Defenses

Although this court allowed SUWA to permissively intervene, it stated, "SUWA is prohibited from asserting new claims, cross-claims, counterclaims, or *defenses* in this matter." Order, at 3 (ECF No. 181) (emphasis added). Prior to *Kane County (2)*, the court had experience with SUWA, as an amicus party, in *Kane County (1)*. In its amicus capacity, SUWA raised several statutes of limitation defenses that required a significant amount of Plaintiffs' time and the court's time to address. Ultimately, the court concluded that none of them had merit, *see Kane Cnty.,*

*Utah*, 934 F. Supp. 2d at 1360–64, which ruling was affirmed on appeal, 772 F.3d 1205 (10th Cir.

2014).[25]

When this court ruled on SUWA's defenses in *Kane County (1)*, it noted the following:

> [W]hen the United States initially filed its Answer [in *Kane County (1)*], it asserted a statute of limitations defense. After conducting discovery on the issue, however, the United States concluded that none of its actions was sufficient to show an adverse claim against Kane County. It therefore stipulated that the statute of limitations had not run. Given that the United States is the very entity that was involved in these matters, and not SUWA, it is in a better position to determine if the United States asserted an adverse claim against Kane County.

*Kane Cnty., Utah*, 934 F. Supp. 2d, at 1364 (internal citations omitted). Recognizing that (1)

SUWA had not added anything meaningful in *Kane County (1)* when it raised the defenses it did,

(2) the United States had exercised proper judgment in defending title and adequately protected

SUWA's interests, and (3) both the parties and the court had expended unnecessary resources to

address issues raised by SUWA, the court sought to avoid the same problem in the new R.S. 2477

road cases. It therefore prohibited SUWA from asserting new defenses in the R.S. 2477 road cases.

On May 30, 2014, the United States filed a Motion for Partial Dismissal, which asserted

the claims in *Garfield County* were barred by Utah Code Ann. § 78B-2-201 on *statute of limitations*

grounds. Mot. to Dismiss, at 58–60 (ECF No. 135 in Case No. 2:11-cv-1045). SUWA requested

leave to file a memorandum in support. It acknowledged it could not raise new defenses and

---

[25] The Tenth Circuit's ruling addressed two memorandum decisions issued by the court. A portion of the court's rulings were reversed by the Tenth Circuit, but none of those portions involved the court's rulings pertaining to SUWA's defenses.

represented that its brief merely "expand[ed] upon certain points" the United States had already raised.  Mem. re Leave to File, at 2 (ECF No. 137 in Case No. 2:11-cv-1045).

Contrary to SUWA's representations, its brief raised a new defense.  It did not expand upon the United States' argument that Plaintiffs' claims were barred by a statute of limitations.  Instead, it argued that § 78B-2-201 is not a statute of limitations at all, but a statute of repose.  Mem. in Supp., at 21 (ECF No. 137-2) (stating "SUWA is compelled to write separately . . . because the United States fails to note" § 78B-2-201 is a statute of repose).

The State originally filed an objection to SUWA's motion.  Mem. in Opp'n (ECF No. 138 in Case No. 2:11-cv-1045).  Later, however, it asked for an extension to respond substantively to the defense raised by SUWA.  Mot. for Extension (ECF No. 141 in Case No. 2:11-cv-1045).  After the State filed its opposition to both the United States' brief and SUWA's, Mem. in Opp'n (ECF No. 147 in Case No. 2:11-cv-1045), the court granted SUWA's motion to file its supporting brief, and made it retroactive to June 27, 2014, to conform the record.  Order (ECF No. 151 in Case No. 2:11-cv-1045).

The court still had the inherent authority to later strike the defense raised by SUWA.  During this same time frame, however, SUWA filed a parallel state action in Tooele County seeking to enjoin the State Attorney General from litigating *all* R.S. 2477 cases based on § 78B-2-201 being a statute of repose.  This placed SUWA in a lead role and multiplied and divided the proceedings.[26]  One way or another, Plaintiffs would have to deal with the defense SUWA raised.

---

[26]  This court temporarily enjoined SUWA from proceeding in the new case under the All Writs Act, 28 U.S.C. § 1651, until it could determine "whether an injunction is appropriate under [the Anti-Injunction Act], 28 U.S.C. § 2283."  *See Tooele County, Utah v. United* States (ECF Nos. 89, 90 in Case No. 2:12-cv-477).  SUWA appealed the matter before the court issued that analysis, and in 2016, the Tenth Circuit struck down the injunction on the ground that it did not meet the

Prior Utah cases addressing § 78B-2-201 had always applied it as a statute of limitations. Certification Order, at 7–8 (ECF No. 211); *see also* (ECF No. 169 in Case No. 2:11-cv-1045). The cases, however, had not directly addressed whether § 78B-2-201 was a statute of repose. "[I]n deference to the State's right to determine the meaning of its laws," the active judges, assigned to the R.S. 2477 road cases in this district, certified the question to the Utah Supreme Court on April 17, 2015. Certification Order, at 3, 9 (ECF No. 211).

On July 26, 2017, the Utah Supreme Court issued its ruling. It concluded that § 78B-2-201 on its face may be read as a statute of repose. But such a construction was "absurd and could not have been intended by the legislature." *Garfield Cnty.*, *v. United States*, 2017 UT 41, ¶ 1, 424 P.3d 46. Consequently, based on the absurdity doctrine, the Utah Supreme Court construed the statute as a statute of limitations. *Id.*

When the Tenth Circuit issued its en banc ruling in *San Juan County, Utah v. United States*, 503 F.3d 1163 (10th Cir. 2007), Judge Kelly authored a concurring decision that was joined by five other judges. They expressed concern over the newly adopted "practical effect" test for intervention due to "the substantial 'practical effect' an intervenor may have on litigation." *Id.* at 1209. They noted "an intervenor in a quiet title action seeking to maintain the land's current use has every incentive to use its participation to postpone a final decision on the merits, thereby prolonging its use at the expense of the parties' need to have a final adjudication of the title." *Id.* Although the concurring judges did not "suggest that SUWA [had] engaged in delaying tactics in

---

Anti-Injunction Act requirements. *Tooele Cnty., Utah v. United States*, 820 F.3d 1183, 1192 (10th Cir. 2016). This court respects that judgment. It does not negate the fact, however, that SUWA multiplied the proceedings.

[the *San Juan*] lawsuit," they noted "the potential for abuse is very real." *Id.* at 1209, n.7. Unfortunately, in the present case, those observations have proved all too true when SUWA has acted to circumvent the court's limitations on SUWA's role in this case.[27]

For over two years, Plaintiffs' time and resources were taxed as they addressed SUWA's arguments before the Utah Supreme Court, which defense was ultimately rejected because it would have "work[ed] such absurd results when applied in the R.S. 2477 cases that" the Utah Supreme Court "was required to apply [its] absurdity doctrine and reform the statutes." *Garfield Cnty.*, 2017 UT 41, ¶ 19, 424 P.3d at 57.

A two-year delay in an R.S. 2477 context means the roads at issue have indefinite road signs to guide the public and a lack of maintenance—both of which impact safety—because the parties do not know who holds title. It also means evidence is lost because the witnesses who have knowledge about a road's use pre-1976 are aging. Some are in poor health, and others have died during the pendency of this litigation. The harm arising from the delay is real, and it has occurred because SUWA thwarted the court's order and insisted on taking a dominant role.

After its statute of repose defense was struck down by the Utah Supreme Court, SUWA filed another new defense.[28] Similar to the first time, SUWA denied it did so. Hearing Tr., at 55–56 (ECF No. 430). In its most recent briefing, SUWA continues to defend its actions by stating

_____

[27] Judge Kelly further observed, "even SUWA's non-abusive appeals [in *San Juan*] had the 'practical effect' of delaying the resolution of [that] lawsuit for three years." *San Juan*, 503 at 1209 n.7. The effects that SUWA has had, and can have, on this case is quite real.

[28] *Compare* SUWA's Answer, at 197 (ECF No. 421) (asserting ninth affirmative defense that "Plaintiffs have failed to accept, or demonstrate acceptance, of any R.S. 2477 right-of-way claimed herein") *with* United States' Answer, at 202–03 (ECF No. 420) (asserting only eight affirmative defenses).

that it did not know that its Answer had to "track[] verbatim with the United States' Answer." Reply Mem., at 10 (ECF No. 713). SUWA's reply is disingenuous. The court never said SUWA's Answer had to track verbatim with the United States' Answer. Instead, the court's order prohibited SUWA from raising new defenses. Order, at 3 (ECF No. 181). The first eight defenses SUWA raised quoted verbatim the United States' defenses. *Compare* United States' Answer, at 202–03 (ECF No. 420) *with* SUWA's Answer, at 196–97 (ECF No. 421). But SUWA then added on a ninth defense that the United States did not raise. *Id.* The simple truth is that SUWA ignored the court's order. Such conduct confirms that SUWA intends to resist this court's efforts to control the litigation and limit SUWA to backstopping the United States as the court originally directed.

**B.  Discovery**

As stated above, SUWA represented to the court it had unique evidence that the United States did not have. That is the premise upon which SUWA was allowed in the case. It was not that it was going to use Plaintiffs' documents to defend the United States' title, but that it had its own information. Accordingly, the court did not allow SUWA to take original party discovery.[29] *See* Order, at 2–3 (ECF No. 181) (authorizing only reasonable third-party discovery).

Then SUWA pressed to expand its limited role. After the Utah Supreme Court issued its decision, SUWA changed its focus to mounting direct attacks on Plaintiffs. It filed a motion on September 28, 2017, to lift a restriction so it could propound discovery on the Plaintiffs. Mot. for Limited Discovery, at 1 (ECF No. 346). The court denied the motion on January 8, 2018. Order, at 2 (ECF No. 357).

---

[29] Plaintiffs and the United States were still required to produce a copy to SUWA of any discovery they exchanged. Order, at 2 (ECF No. 181).

On May 4, 2018, SUWA sought leave to file a motion for scheduling order that again asserted the restriction needed to be lifted to "confirm SUWA's discovery rights."  Mot. for Leave re Scheduling Order, at 8 (ECF No. 389).  It said it had approached Plaintiffs to work out an agreement about SUWA's discovery rights, but Plaintiffs would not agree.  *Id.* at 10.  SUWA then argued it had "*no choice* but to approach the Court for relief."  *Id.* (emphasis added).  In actuality, this was just another attempt to get the court to expand its intervention order.

Nevertheless, based on SUWA's arguments and this being a bellwether case, the court issued a Bellwether Trial Scheduling Order that allowed SUWA to propound non-duplicative discovery on the parties, but only *after* SUWA obtained permission from the court.  Bellwether Order, at 1 (ECF No. 406).  Thus, while modifying its order, the court simultaneously placed a different restriction to ensure SUWA would not abuse that modification.

Despite the court's ruling, SUWA demanded discovery in a letter to Plaintiffs on September 14, 2018.  It was six pages, single spaced, and asserted that Plaintiffs' production of discovery was lacking.  Letter, at 2 (ECF No. 516-10).  It further contended that SUWA may have some follow up for additional discovery in the future.  *Id.*  It then directed Plaintiffs to produce specific portions of the discovery no later than September 28, 2018.  *Id.* at 5.  SUWA did not seek leave of the court to pursue such discovery.  It attempted to argue, however, that Plaintiffs were at fault for not engaging in a meaningful meet and confer with them.  *See* Fourth Mot. to Intervene, at 28–29 (ECF No. 516).  Moreover, it still contends that "[n]o order from the Court prohibited SUWA from corresponding with the other parties, regarding discovery or otherwise."  Reply Mem., at 11 (ECF No. 713).  Again, SUWA's response misses the point.  Issuing a six-page, single spaced document to Plaintiffs about documents Plaintiffs were to produce to SUWA constitutes

discovery.  Whether the discovery is formal or informal, it is still discovery.  These end runs around the conditions set by the court are unacceptable.  They show a disregard for the court's rulings, and they continue to multiply the proceedings by an intervenor who was only supposed to have a limited role.

### C.    Motions

The court also restricted SUWA from filing motions without leave of court.  By having to ask to file a motion, the limitation was meant to reflect such motions should be infrequent and made with care.  As stated above, the court intended for the original parties to lead the case, and not have their attention and the court's attention diverted by SUWA.

While SUWA dutifully filed motions for leave to file a motion most of the time, those actions merely had the appearance of compliance with the purpose behind the limitation.  The court recognized it was frequently addressing motions filed by SUWA, but it failed to comprehend just how far SUWA had gone from the restrictions the court had imposed.  In truth, SUWA filed about *four times* as many motions as any other party before the court imposed further restrictions on September 5, 2019.[30]  In hindsight, the court recognizes how much SUWA dominated the proceedings by its motion practice, until SUWA was further limited in its role, and that the court should have stopped its filings earlier to prevent the parties from having to address the issues raised by SUWA.

---

[30]  The court has separated out the motions for leave to file a motion from the motion itself and not double counted them.  The court also excluded counting motions similar to the following type: pro hac vice motions; motions to extend time to file a brief; motions to file excess pages; and motions to vacate a hearing.  The court focused on the period from April 22, 2013, when SUWA filed its first motion to intervene on this docket, to September 5, 2019, when SUWA's role was further limited.

The court notes, however, that when the court did deny a motion for leave to file a motion, SUWA ignored that denial. One of the instances occurred when SUWA sought leave on May 15, 2018, to file another motion to intervene as of right. Mot. for Leave re Mot. to Intervene (ECF No. 398). The court denied the request. Dkt. Text Order (ECF No. 402).

Despite having denied the request, during the next hearing on another matter in this case, SUWA said it had "some limited comments [it] would like to make." Hearing Tr., at 8 (ECF No. 418). SUWA then proceeded to argue about how it needed to build its defenses and needed the discovery limitations lifted. *See id.* at 8–24. It further argued how things have changed and why intervention as of right was appropriate. *Id.* at 19–24. In other words, it argued its motion to intervene, which the court had already disallowed. SUWA also asked to lodge its brief. *Id.* at 20. The court granted permission to *lodge* it, *id.* at 30, but four days after the hearing, SUWA filed its brief as a motion. *See* Motion to Intervene (ECF No. 410). Thus, even when SUWA was denied leave to file a motion, that denial only meant SUWA sought ways around it. SUWA had its motion fully heard, and it later filed its motion, rather than lodging it as the court directed.

During the same hearing, after SUWA said it had some limited comments to make, it pulled up a power point presentation and said it was skipping past many of the slides. Hearing Tr., at 9 (ECF No. 418). After making its intervention arguments, SUWA's counsel stated, "[t]ypically it is *my practice* when I present a slide to the court here to lodge that. May I have leave to file the electronic copy *of what I presented* to you." *Id.* at 30 (emphasis added). The court allowed the filing based on how the statement was presented. Thereafter, SUWA lodged a twenty-five page, one-sided, slide presentation that presents multiple arguments, including full argument on its motion to intervene. *See* Notice re Visual Presentation (ECF No. 407). The slide presentation was

not limited to the few slides presented in court.  Moreover, contrary to its representations to the court during the hearing, SUWA has filed no other visual presentations in *Kane County (2)*, the *Garfield County* case, or the *Tooele County* case.  In other words, SUWA's practice had been *not* to file slide presentations despite SUWA's representation to the contrary.  SUWA used these tactics to affect the record.  A record it only has access to because the court allowed it to intervene permissively.  SUWA has abused that access through its excessive motion practice and gamesmanship.

### D.     Nature of Representations to the Court

During a hearing where SUWA stated its planned to put on a "vigorous" defense, SUWA said its "vigorous advocacy" is required under the "rules of professional conduct," and therefore its actions could not be "an abuse or a prejudice."  *See e.g.*, Hearing Tr., at 11, 16, 18 (ECF No. 418).  Being an advocate, however, does not excuse SUWA's conduct in ignoring the court's orders.  It also does not excuse counsel from the care required when making representations to the court.  SUWA has failed to exercise the proper care.  The court uses SUWA's Fourth Motion to Intervene to illustrate this point.

SUWA said it "has largely been a mere bystander" in this litigation.  Fourth Mot. to Intervene, at 2 (ECF No. 516).  The above facts do not bear this out.

It also said that the "Trump administration's decision to gut the Grand Staircase-Escalante National Monument . . .  rescind[ed] federal protection over all or part of twelve of the fifteen Bellwether routes at issue in this case."  *Id.* at 15.  This implies there is no federal protection of the routes.  Yet, the routes remain on federal land under BLM management.

SUWA also represented that during a seventeen-month period,[31] when SUWA was not a permissive intervenor in this case, "Plaintiffs took a slew of depositions, none of which SUWA was permitted to participate in, and ten of which Plaintiffs now intend to use at trial." *Id.* at 18. This implies SUWA had no involvement in the depositions. That is incorrect. SUWA was permitted to attend the depositions and ask questions through the United States, which it did do.[32] *See* Mem. in Opp'n, at 5–6 and Attached Exhibits (ECF No. 523).

SUWA further represented it could not "issue its own discovery," which also is not true. Mot. to Intervene, at 18 (ECF No. 516). As long as third-party discovery was reasonable, SUWA was allowed by the court's order to issue subpoenas. Order, at 2 (ECF No. 181). Unfortunately, SUWA abused this right by consistently issuing subpoenas that were overbroad. *See e.g.*, Mem. Dec., at 5 (ECF No. 394) (quashing subpoena because "for five categories of information," SUWA sought "all documents" related to the 770 roads claimed by Kane County and the 730 roads claimed

---

[31]  This court has been assigned *Kane County (1)* since November 2008. It was assigned case management of *Kane County (2)* on March 13, 2013, along with the other R.S. 2477 cases. *See* Mem. Dec. (ECF No. 78). On April 17, 2013, this court allowed SUWA to attend all preservation depositions before its Motions to Intervene were addressed. Minute Entry (ECF No. 89). On May 31, 2013, this court transferred *Kane County (2)* back to the presiding judge due to a pending dispositive motion. Docket Order (ECF No. 121). At that point, SUWA's motions to intervene had not been fully briefed and because the court was no longer assigned the case, it did not address the motions to intervene. On June 17, 2014, the presiding judge referred the case back to this court for consideration of SUWA's two pending Motions to Intervene. Order (ECF No. 171). The court ruled on the motions on September 10, 2014. *See* Order (ECF No. 181). This is the seventeen-month period referenced by SUWA. The court notes that on August 29, 2015, the presiding judge recused from this case (ECF No. 252), but this court continued to address all case management issues. This case was then formally assigned to this court on January 26, 2018 (ECF No. 363).

[32]  Once SUWA was admitted as a permissive intervenor, the court amended its ruling so SUWA could ask questions directly, but subject to time limitations. Order, at 3 (ECF No. 181); *see also* Second Amended Permissive Intervention Order, at 3 (ECF No. 184).

by Garfield County, even though this case is only focused on 15 roads presently to ensure proper management and avoidance of undue burdens).

SUWA also said it could not assert a new defense without obtaining permission. Mot. to Intervene, at 18 (ECF No. 516). That is incorrect. SUWA is prohibited from asserting new defenses—period. Order, at 3 (ECF No. 181). There is no provision in the court's intervention order allowing for leave on this subject,[33] but SUWA has ignored that limitation.

SUWA also asserted the preservation depositions were one-sided, with only the Plaintiffs taking them. *See* Mot. to Intervene, at 19–20 (ECF No. 516). Yet, the intervention order allowed SUWA to seek leave to depose witnesses not listed by Plaintiffs. Order, at 2 (ECF No. 181).

All of these representations were made in one document. The court does not believe it necessary or useful to detail all of the other instances when SUWA has misrepresented a proceeding, or acted contrary to a court order, but they exist not only in the record of this case, but in the other R.S. 2477 cases this court is assigned and/or managing. Such conduct is not appropriate for any party, much less a party that is a limited permissive intervenor.

On September 5, 2019, the court ruled on SUWA's fourth motion to intervene, and further limited SUWA's role as a permissive intervenor for case management purposes, including to

---

[33] *See* original Memorandum Decision on Intervention, *Sevier County v. United States*, No. 2:12-cv-452, 2013 WL 2643608, at *5 (D. Utah June 12, 2013) (stating "SUWA is prohibited from asserting new . . . defenses in the Road Cases," and that when making "an argument not made by the United States," that argument "shall be limited in scope to the existing claims or defenses in the case"); *see also* Modified Order re Permissive Intervention, at 4 (ECF No. 124 in Case No. 2:11-cv-1045 and Modified Order, at 4 (ECF No. 91 in Case No. 2:12-cv-452) (stating the same); Second Amended Permissive Intervention Order, at 3–4 (ECF No. 184) (same); Third Amended Permissive Intervention Order, 3 (ECF No. 405) (same); Fourth Amended Permissive Intervention Order, at 3 (ECF No. 550) (same).

ensure manageability of the case and to avoid further delays.  *See* Mem. Dec., at 37 (ECF No. 549); Fourth Amended Permissive Intervention Order, at 2 (ECF No. 550).  It also limited SUWA's role to help ensure a fair process for the parties, thereby avoiding further harm them.  *See* Mem. Dec., at 37.

The additional limitations imposed on September 5, 2019, have proven helpful with case management and did shift the case back to focusing on the original parties.  Unfortunately, the court's detailed warning in the September 5, 2019 decision has not had an impact on SUWA's continued pattern of mischaracterizing information to gain an advantage or its sharp litigation practices as discussed next.

## II.    SUWA'S CONTINUED CONDUCT

### A.    Overreaching

Based on the *Intervention Ruling*, pertaining solely to the issue of scope and not ownership, SUWA now contends the *Intervention Ruling* necessarily applies to ownership, so SUWA must be allowed to intervene on all issues in *Kane County (2)*.  The court agrees with Kane County that such overreaching has "become a standard practice" of SUWA.  County's Mem. in Opp'n to Intervention Mot., at 21 (ECF No. 649).  Such conduct continues to multiply the proceedings.

### B.    Representations about Width

SUWA also continues to misstate the width issue.  After Plaintiffs expressly stated they do not plan to increase the width of the roads in this case, SUWA asserted Plaintiffs' representation was "especially bizarre."  Reply Mem., at 5 (ECF No. 654).  SUWA represented that "Plaintiffs from the outset of [*Kane County (2)*] have in fact been asking this Court to permit them to open every closed bellwether route and expand every bellwether route into a highway of at least 66

feet."  *Id.*  SUWA cited the County's Amended Complaint in this case to support SUWA's representation.  *Id.* at 5 n.16.  SUWA's representation has a partial truth to give it credibility, but SUWA coupled it with an exaggeration or mischaracterization to obtain SUWA's desired outcome. As the court stated above, however, there is a difference between the travel surface width and the non-travel surface width.  To the extent SUWA is implying this litigation is meant to change the travel surface of every bellwether route to 66 feet, that is not accurate.[34]

### C.    May 19, 2022 Representations

Another event also discloses that, despite the court's September 5, 2019 admonition, SUWA still is not being candid with the court and appears to be engaged in further gamesmanship. The court held a Status Conference on May 19, 2022 in *Kane County (1)*.  "SUWA informed the court that preservation depositions were going to resume on June 6, 2022 in another case."  Dkt. Text Order (ECF No. 725 in Case No. 2:10-cv-1073).  SUWA asked for the court to revoke the Fourth Amended Permissive Intervention Order and reinstate the Third Permissive Intervention Order on the reported ground that it would allow SUWA to participate more fully at the upcoming depositions.  "SUWA represented to the court that it did not consult with counsel for Kane County [about the issue] because they were not going to be involved in the depositions."  *Id.*

---

[34] On its website, SUWA has engaged in the same types of characterizations.  State's Opp'n to Returning to the Third Amended Permissive Intervention Order, at 5 (ECF No. 162 in Case No. 2:12-cv-452).  "In an entry . . . entitled 'Hoax Highways,' SUWA represents to the public" that "the overwhelming majority" of the roads "'are wash bottoms, cow paths, and two-tracks in the desert, which the state and counties seek to improve (by paving, for example) and widen up to sixty-six feet—about as wide as ten passenger cars.'" *Id.* (quoting https://suwa.org/issues/phantom-roads-r-s-2477/).  The court will discuss more about the *Sevier County* case in the next section.

Because the Third and Fourth Permissive Intervention Orders are "not applicable in *Kane County (1)*, and the County in which depositions [were] to be taken need[ed] notice about SUWA's motion, the court instructed SUWA to file a Motion for Leave to File in the appropriate case. SUWA stated it would do so." *Id.*   SUWA, however, did not do what it said it would do.  "Instead, SUWA filed its motion in this case, which is *Kane County (2) vs. United States*." *Id.*

To reiterate, SUWA informed the court that it did not consult with Kane County about its proposal because Kane County would "not be involved in the June 6, 2022 depositions."  Yet, SUWA filed the motion in the *Kane County (2)* case and did not provide notice to the relevant county about its intentions.  In the motion for leave to file the motion, SUWA represented that it intended "to file a single omnibus motion in [*Kane County (2)*] seeking to return to the Third Permissive Intervention Order in *all* R.S. 2477 cases" then subject to the Fourth Permissive Intervention Order, unless directed to file its motion in all such cases.  Mot. for Leave, at 2 (ECF No. 724 in Case No. 2:10-cv-1073) (emphasis added).  The application to "all" also went beyond the scope stated at the May 19, 2022 hearing.  Moreover, rather than depriving one county of notice, SUWA's motion would have denied all relevant counties of notice had it been permitted to file a single omnibus motion in *Kane County (2)*.

This recent chain of events is indicative of how SUWA has litigated in these road cases. Whenever it is afforded any leeway, problems arise.  And SUWA continues to disregard the rights of others in pursuit of its own interests.

48

### D.      Bull Valley Gorge

In its Fifth Motion to Intervene, SUWA references the *Bull Valley Gorge* case[35] to support

that SUWA should be allowed to intervene as of right in this case.  The *Bull Valley Gorge* case

does not support that proposition and is another example of how SUWA's ignores the rights of

others.

Bull Valley Gorge is a narrow slot canyon that intersects the Skutumpah road in Kane

County.  The underlying facts of the *Bull Valley Gorge* case pertained to whether a bridge that

crosses the canyon exceeded the scope of the Skutumpah right-of-way and required BLM

consultation.  Skutumpah is an adjudicated R.S. 2477 right-of-way, but its scope has not been

determined yet.  That issue is before the court in *Kane County (1)*.

Even though none of the facts relating to the bridge or Skutumpah are at issue in this case,

SUWA argued in its motion that the United States could not defend itself in the *Bull Valley Gorge*

case, and still adequately represent SUWA's interests in this one.  Reply Brief, at 7–8 (ECF No.

713).  Due to the narrow scope of the *Bull Valley Gorge* case, and that Skutumpah is not at issue

in this case, the court disagrees *Bull Valley Gorge* precluded the United States from adequately

representing SUWA in this case.  That said, SUWA has since dismissed the *Bull Valley Gorge*

case voluntarily, *see* (ECF No. 53 in Case No. 2:20-cv-539), so any asserted tension is no longer

at issue.  SUWA's actions in the *Bull Valley Gorge* case, however, are relevant here.  Accordingly,

the court now turns to them.

---

[35]  The case name for the Bull Valley Gorge case is *Southern Utah Wilderness Alliance v. United States Bureau of Land Management*, No. 2:20-cv-539 (D. Utah).

Tragically, "[i]n 1954, a truck went over the [Bull Valley Gorge] bridge and became tightly wedged in the slot canyon.  Earthen materials were filled in over the truck to rebuild the bridge after the accident."  Mem. Dec., at 2 (ECF No. 356 in Case No. 2:08-cv-315).  Other repairs occurred over the years.  Then in or about March 2019, either a flash flood washed the bridge away or the bridge collapsed taking "away approximately eighty percent of the bridge."  *Id.*  "[T]hat stretch of Skutumpah had to be closed."  *Id.*  This was a problem because "Skutumpah has served as an important road between two communities for many years."  *Id.*

After "submitting plans to the BLM" about how it intended to replace the bridge, Kane County installed a reengineered bridge in 2020.[36]  *Id.*  SUWA then sued the BLM in the *Bull Valley Gorge* case "on the bases that the BLM had misclassified the nature of the project and [had] failed to conduct a necessary analysis under the National Environmental Policy Act ("NEPA")."[37]  *Id.*  Notably, however, SUWA did not name Kane County as a party even though (1) the County has an adjudicated R.S. 2477 right-of-way for Skutumpah, (2) the bridge at issue is Kane County's property,[38] and (3) an underlying issue pertained to whether the bridge fell within the scope of Kane County's right-of-way for Skutumpah.

As the court stated above, SUWA refuses to recognize the rights of others when it disagrees with those rights.  Even though the County now has an adjudicated right-of-way for the Skutumpah

---

[36]  The County did not disturb the truck that is lodged in the slot canyon and formed the basis for the prior bridge.  Amended Mot. to Intervene, at 8 (ECF No. 49 in Case No. 2:20-cv-539).

[37]  The court does not express an opinion about whether the bridge replacement constituted maintenance or an improvement.

[38]  Kane County requisitioned and paid for the bridge.  Amended Mot. to Intervene, at 2–3, 14 (ECF No. 49 in Case No. 2:20-cv-539).

road, SUWA excluded the County as a participant when it filed suit, potentially to the County's harm.

Before the County attempted to intervene to defend its rights, another judge in this district entered a decision in the *Bull Valley Gorge* case that has far reaching implications if it is followed in other cases.[39]  *See S. Utah Wilderness All. v. United States Bureau of Land Mgmt.*, 551 F. Supp. 3d 1226 (D. Utah 2021) (hereinafter the "*Bull Valley* decision").

In 2005, the Tenth Circuit issued *Southern Utah Wilderness Alliance v. Bureau of Land Management*, 425 F.3d 735 (10th Cir. 2005) (hereinafter the "2005 Case").  The Tenth Court grappled with the parameters of an R.S. 2477 right-of-way and what rights were attendant to title. *Id.* at 741–42.  It recognized too loose or too tight of an interpretation could have unintended effects. *Id.* at 742.  One of the rights that was before the Court was whether a county had to consult with the BLM before it did work on a right-of-way.  Road crews from three counties had graded sixteen roads located on federal lands without notifying the BLM. *Id.*  The counties asserted their R.S. 2477 rights allowed them to engage in such activities, but SUWA filed suit and asserted the counties' actions violated FLPMA, NEPA, and the Antiquities Act, 16 U.S.C. § 431. *Id.* at 742–43.  Thus, the issue before the Tenth Circuit pertained to the statutory interpretation of R.S. 2477.

"R.S. 2477 is a federal statue and it governs the disposition of rights to federal property, a power constitutionally vested in Congress." *Id.* at 762 (citations omitted).  Additionally, "[t]he construction of grants by the United States is a federal not a state question." *Id.* (quotations and

---

[39] Shortly after the decision issued, the *Bull Valley Gorge* case was transferred to this court because it became intertwined with the scope issue that remains in *Kane County (1)* for Skutumpah. Mem. Dec., 5–6 (ECF No. 356 in Case No. 2:08-cv-315).

citations omitted).  Nevertheless, "it is not uncommon for courts to 'borrow' state law *to aid in interpretation of federal statute*."  *Id.* (emphasis added).

Accordingly, in the 2005 Case, the Tenth Circuit applied these principles and borrowed certain portions of common law to establish the parameters of R.S. 2477 rights because "when Congress granted rights of way" under R.S. 2477, it was aware of and incorporated the common law pertaining to the nature of public highways and how they are established."  *Id.* at 763–64.  In other words, the R.S. 2477 statutory rights are based on principles of common law, but the rights still remain statutory because they were incorporated therein.  Accordingly, the Court's discussion of common law must be read in that context.  The discussion separated out "maintenance" from "improvements" as the boundary for R.S. 2477 rights.  *Id.* at 748–49.

In the *Bull Valley Gorge* decision, however, the Court stated that the consultation obligation arising from the maintenance versus improvement differentiation was only a matter of common law.  *Bull Valley Gorge*, 551 F. Supp. 3d at 1240–41.  Because the Administrative Procedures Act does not permit review of common law matters, the court concluded the APA was inapplicable in the *Bull Valley Gorge* decision.  *Id.* at 1242.  The court then set a new standard for how or when the BLM must act when a county proposes a project and reversed the BLM's final agency action under that standard.[40]  *Id.* at 1244.  The *Bull Valley Gorge* decision arguably reached an erroneous legal conclusion and has the potential to impact Kane County negatively on future projects.

---

[40]  After reversing the BLM, the Court set the matter for further briefing.  *Bull Valley Gorge*, 551 F. Supp. 3d at 1244.  For reasons stated below, however, the *Bull Valley Gorge* decision ultimately was never implemented in that case and had no effect on the bridge.

Counsel for Kane County is the same counsel who appeared before the Tenth Circuit in the 2005 Case.  It knows what issue was before that Court.  It also knows best what actions it took relative to the Bull Valley Gorge bridge.  Had SUWA not excluded the County when it filed suit, the County's viewpoints could have been heard before the *Bull Valley Gorge* decision issued. Shortly after Kane County moved to intervene, however, SUWA voluntarily dismissed the *Bull Valley* case with prejudice.  *Compare* Mot. to Intervene (ECF No. 36 in Case. No. 2:20-cv-539) (filed on Sept. 8, 2021) *with* Stipulation of Dismissal (ECF No. 53 in Case No. 2:20-cv-539) (filed on Oct. 27, 2021).

Essentially, SUWA "will do whatever it wants to do."  Kane Cnty.'s Memo. in Opp'n, at 23 (ECF No. 649 in Case No. 2:10-cv-1073).  Accordingly, the court concludes the limitations placed on SUWA's role are still necessary to facilitate case management and ensure a fair process for the original parties.  The Fourth Amended Permissive Intervention Order shall therefore remain in place in all cases to which it presently applies.

## CONCLUSION

For the reasons stated above, the court DENIES SUWA's motion to intervene as of right (ECF No. 607) in *Kane County (2)*.  The Fourth Amended Permissive Intervention Order shall remain in place in all cases to which it presently applies.  In the event there is any question, the court informs SUWA that if it wishes to appeal this decision, the Fourth Amended Permissive Intervention Order does not preclude SUWA from filing the requisite Notice of Interlocutory Appeal.

DATED this 6th day of June, 2022.

BY THE COURT:

Clark Waddoups
United States District Judge